SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BRENDA MCCOY,

       Plaintiff,

v.                              Civil Action No. 2:11-00927

NORFOLK SOUTHERN RAILWAY COMPANY and
NORFOLK SOUTHERN CORPORATION and
JACK STEPP,

       Defendants.

MEMORANDUM OPINION AND ORDER


       Pending are 1) the motion of defendant Norfolk
Southern Corporation to dismiss for insufficient service of
process or, alternatively, to quash service, filed November 23,
2011; 2) the motion of defendant Jack Stepp (the "nondiverse
defendant") to dismiss, filed November 23, 2011; 3) plaintiff's
motion to remand, filed December 2, 2011; and 4) plaintiff's
motion for leave to amend, filed February 17, 2012.


       When, as here, a motion to remand and a motion to
dismiss under Rule 12(b)(5) and 12(b)(6) are made, it is
ordinarily improper to resolve the motions to dismiss before
deciding the motion to remand.  The question arising on the
motion to remand as to whether there has been a fraudulent
joinder is a jurisdictional inquiry.  See Batoff v. State Farm
Ins. Co., 977 F.2d 848, 852 (3rd Cir. 1992); cf. Mayes v.

Rapoport, 198 F.3d 457, 460 (4th Cir. 1999) (observing that the propriety of removal and fraudulent joinder are jurisdictional questions).

## I.   Background

The claims at issue in this case arise from a troubled, two decade-long relationship between plaintiff's family and defendant Norfolk Southern Railway Company ("Norfolk Railway").  Plaintiff Brenda McCoy is a resident of Sprigg, Mingo County, West Virginia.  Defendant Norfolk Railway is a Virginia corporation with its principal place of business in Norfolk, Virginia.  Defendant Norfolk Southern Corporation is also a Virginia corporation with its principal place of business in Norfolk, Virginia, and is the parent company of Norfolk Railway (together, the "Norfolk defendants").  Defendant Jack Stepp, who at all relevant times was employed by Norfolk Railway as a track supervisor, is a West Virginia resident.  The following factual recitation is taken from the amended complaint on which the case was pending at the time of removal, the operative pleading for purposes of plaintiff's motion to remand.[1]

---

[1] The court adheres to the rule, also followed in the Fifth and Eleventh Circuits, that a "plaintiff must not be allowed to

(contin.).

2

Nestled in the mountains of southern West Virginia and located along the Kentucky border as drawn by the Tug Fork River lies the unincorporated community of Sprigg.  Transected by the railway and State Route 49, Sprigg sits a little more than halfway between Williamson, the county seat of Mingo County, and the town of Matewan, West Virginia.  Like much of southern West Virginia, coal mining has long driven the economy of Mingo County, and its impact on the village of Sprigg is no less marked.

In the early 1990s, the Tug Valley Land Company ("Tug Valley Co.") entered into discussions with plaintiff and her late husband, Robert McCoy, for the purchase of their homestead property situated in Sprigg ("original McCoy parcel").  Tug Valley Co., a subsidiary of Massey Coal Sales, Inc., desired to acquire the original McCoy parcel in order to construct a bridge

---

re-plead the complaint [after removal] in an attempt to divest this court of jurisdiction by hindsight."  Justice v. Branch Banking & Trust Co., 2009 WL 853993, at *7 (S.D. W. Va. 2009); see also Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 265 (5th Cir. 1995) ("removal jurisdiction should be determined on the basis of the state court complaint at the time of removal, and . . . a plaintiff cannot defeat removal by amending it"); Legg v. Wyeth, 428 F.3d 1317, 1322 (11th Cir. 2005) (relevant pleading for fraudulent joinder determination is the complaint that existed at time of removal); see generally Baisden v. Bayer Corp., 275 F. Supp. 2d 759, 763 (S.D. W. Va. 2003) (stating that jurisdiction is determined at the time of removal).

across the Tug Fork River.  (Amended Complaint, Material Facts ¶ 5).  It was determined that time that construction of the bridge and connecting private road to Route 49 would drastically reduce the coal hauling distance from Massey's Long Fork mining operations in Pike County, Kentucky, to Massey's Rawl Sales & Processing Company's Sprouse Creek coal processing plant in Lobata, West Virginia, from 23.2 miles to 2.3 miles one way.  (Id.).

In consideration for the original McCoy parcel, Tug Valley Co. offered to pay the McCoys' loan on the property in full, convey to them a new homestead parcel about a mile upstream, and pay all relocation expenses plus $10,000, for a total purchase price of $150,000.  (Id. ¶ 6).  The transaction was consummated and title to the new parcel was transferred to plaintiff's husband on September 11, 1992.  (Id. ¶ 3).  Prior to the transaction, though, several discussions were held with regard to the new parcel -- the subject property underlying plaintiff's present suit.

In particular, the McCoys questioned George Farley, agent for Tug Valley Co., about access to the new parcel.  He advised the McCoys that the property was served via State Route 49 by a railroad crossing.  (Id. ¶ 7).  Mr. Farley further arranged for the McCoys to meet with the then-Norfolk Railway

4

track supervisor Michael Birkelbach to discuss the crossing.
(Id.). Mr. Birkelbach took the McCoys to the location of an
abandoned railroad crossing that had previously provided access
to the new parcel from Route 49. (Id. ¶ 8). He informed them
that the property had always been served by the now-defunct
crossing and orally promised that it would be reinstalled to
allow access to their new property. (Id.). At that time,
Birkelbach pledged to complete the proper paperwork for the
reinstallation of the crossing. (Id.).

The location of the derelict crossing was visually
apparent when the McCoys acquired the new parcel, and it remains
so. (Id. ¶ 11). In fact, when the McCoys had a fence installed
along the front of their new property, the entrance gate was
placed in-line with the location of the abandoned crossing.
(Id. ¶ 12). An access road adjoining the crossing and an
entrance point to Route 49 were also visually apparent when the
McCoys took possession of the property and remain so. (Id. ¶
13).

Until the crossing could be reinstalled, the McCoys
were directed to use defendant Norfolk Railway's gravel service
road to access their new property. No other access routes were
available for the new parcel inasmuch as it was wholly bound by
railway property on one side and the Tug Fork River on the

other.  At all pertinent times, the service road was a gravel
road that ran directly alongside the railroad.  It began at the
closest functioning railroad crossing, near the entrance to
Route 49 in Sprigg, and followed directly alongside the railroad
tracks in an upstream direction, away from Sprigg proper for
approximately one mile, to the new parcel.  The McCoys consented
to the property transaction with the understanding that they
would need to use the service road until the derelict crossing
could be restored to active service.  Significantly, it is
impossible to access plaintiff's property from either the
railroad crossing in Sprigg or the crossing further upstream in
Merrimac, West Virginia, without utilizing the service road.

        Following the transaction, Birkelbach informed the
McCoys that adjacent property owners, Joseph and Irene Cooper,
objected to the reinstallation of the railroad crossing.  (Id. ¶
14).  Mr. Birkelbach advised the McCoys that Norfolk Railway
would require documentation supporting an easement from the
Coopers before it could reinstall the crossing.  The McCoys
continued to use the service road to access their property until
the easement matter was resolved.  (Id.).  Soon after, a right-
of-way easement was obtained from the Coopers and notice of the
same was forwarded to Norfolk Railway track supervisor

6

Birkelbach and Norfolk Southern Corporation's superintendent,
D.M. Kimbrough, on June 5, 1993.  (<u>Id.</u> ¶ 15).

        Subsequently, however, Birkelbach informed the McCoys
that Norfolk Southern Corporation had decided it would be too
dangerous to reinstall the crossing due to "limited sight
distance."  (<u>Id.</u>).[2] Upon the Norfolk defendants' failure to
reinstall the railroad crossing, Birkelbach advised the McCoys
to continue using the railroad crossing located approximately
one mile downstream at Sprigg, which, as noted above, provided
access to the gravel service road situated adjacent to the
railway.  (<u>Id.</u>).  The McCoys expressed concerns to
Superintendent Kimbrough about the decision not to reinstall the
crossing and the continuing need to use the service road.  (<u>Id.</u>
¶ 16).  Even so, by letter dated December 28, 1993, Kimbrough
still refused to reinstall the railroad crossing and claimed
that it would be dangerous to do so.  (<u>Id.</u>).

        Out of continued concerns for the potential hazardous
conditions and the ability to secure emergency services
presented by the newly proposed permanent route of access,

---

        [2] It is unclear from plaintiff's complaint what she means by
"limited sight distance," though it seems likely that this
refers to the inability of train operators to view the crossing
from a safe distance before actually reaching it.

plaintiff contacted Congressman Nick Joe Rahall, member of the
United States House of Representatives, on February 2, 1994,
requesting a congressional inquiry.  By letter dated February 9,
1994, Kimbrough reiterated to Representative Rahall "that it
would be extremely dangerous for the vehicles transversing the
requested crossing" and "that there is now access to Mr. McCoy's
house from another crossing a very short distance away."  (Id. ¶
17).

        Eventually, plaintiff[3] resigned herself to utilizing
the gravel service road as the only means of accessing her
property, and she has continuously used the service road under
the direction and full knowledge of the Norfolk defendants, for
nearly two decades.  (Id. ¶ 19).  For instance, the proximity of
the service road to the railroad tracks required "agents of the
railway" to dispatch a flagman to permit the safe delivery of
the McCoy's single-wide mobile home in 1992.  (Id. ¶ 19(A)).
Likewise, railway agents dispatched another flagman to assist in
the delivery of a second mobile home and other required
foundation materials in 1997.  (Id. ¶ 19(B)).  Moreover, the
railway has also expressly permitted various public utilities

---

        [3] Plaintiff's husband, Robert McCoy, died on June 27, 2002,
and the plaintiff came into full ownership of the new parcel
upon her husband's death at that time.

over the years to use the gravel service road for the purpose of servicing plaintiff's residence. (<u>Id.</u> ¶ 19(C)). Finally, prior to the appointment of the nondiverse defendant as track supervisor, Norfolk Railway had performed all maintenance on the service road. At the same time, it prohibited the McCoys from performing maintenance on the road due to the risk of harming the adjacent rail and ties. (<u>Id.</u> ¶ 19(D)).

In the late fall of 2008, travel on the service road became difficult due to a lack of maintenance. Plaintiff phoned Norfolk Railway's Williamson, West Virginia office, and was advised that she would need to address maintenance concerns with the current track supervisor, defendant Jack Stepp. (<u>Id.</u> ¶ 20). Ms. McCoy subsequently met with Stepp, and he dispatched a backhoe to improve the condition of the service road. (<u>Id.</u> ¶ 21). However, while the former track supervisor routinely performed maintenance, including the removal of gravel, debris, and weeds from the road, which provided a visually clear and safe roadway, under Stepp's direction, the operator only leveled the gravel on the road. According to plaintiff, this created a deep and shifting gravel surface with overgrown vegetation and concealed the edge of the roadway. (<u>Id.</u>). On one occasion, as a result of the minimal maintenance, plaintiff's minor daughter, while walking to the bus stop at Sprigg, lost traction in the

deep gravel near the edge of the service road -- which was concealed by weeds -- and slid over the embankment.  (Id. ¶ 22).[4] Following the accident, plaintiff again phoned Norfolk Railway's Williamson office and spoke to Charlie Frazier, who advised her to address her concerns to the Mingo County Commission.  (Id. ¶ 23).  After contacting the Mingo County Commission, Mingo County Emergency Services Director Jarrod Fletcher, Mingo County Commissioner David Baisden, Emergency Services Director Bill Davis, and Mingo County Board of Education Director of Transportation Joe Howard inspected and evaluated the service road.  (Id. ¶ 24).  Subsequently, on October 21, 2008, Fletcher contacted Frazier and reported that he was concerned about the areas of the service road that were breaking off and creating narrow sections in which vehicles were dangerously close to passing trains and steep embankments along the river.  Mr. Fletcher requested that "Norfolk Southern rectify safety hazards in five sections of the railroad right-of-way before someone was injured."  (Id. ¶ 25).

Mingo County Commissioner Greg K. Smith suggested that plaintiff speak with Ray Messer, Superintendent of the Mingo

---

[4] Whether plaintiff's daughter sustained any injuries with respect to the accident is unclear.  In any event, plaintiff does not seek damages for that accident in this action.

County Division of the Department of Highways, to determine if he might be able to assist in widening the road by disposing of refuse removed along Route 49 into the areas of concern. (Id. ¶ 26). Plaintiff contacted Stepp and discussed Commissioner Smith's recommendation and followed up by letter dated November 6, 2008. (Id. ¶ 27). Plaintiff then met with Messer who agreed to dump fill material along the service road if Stepp would permit the Department of Highways to backfill the areas of concern. (Id. ¶ 28).

Despite multiple attempts by plaintiff to contact Stepp to discuss Messer's willingness to assist, he never responded. Instead, plaintiff was ultimately referred to Chris Carney, division engineer and real estate specialist for the Norfolk defendants, who met with her and inspected the service road. Mr. Carney later informed plaintiff that Stepp reported that he could navigate the service road with larger service trucks without incident, and therefore Norfolk Railway did not find a need for any repairs. Mr. Carney further notified plaintiff that there was a question as to whether she was trespassing by utilizing the service road. (Id. ¶ 29).

On December 16, 2008, plaintiff again contacted Representative Rahall, requesting a second inquiry. On January 23, 2009, an agent of a Norfolk defendant[5] forwarded to Representative Rahall's office Carney's internal email dated December 22, 2008, which reported that Stepp traveled the service road with large two-ton trucks without incident, and that they were in the process of determining whether plaintiff even had the right to use the service road. (<u>Id.</u> ¶ 30).

According to plaintiff, defendants have since stopped performing maintenance on the railway service road, which is greatly increasing the hazardous narrow conditions of the roadway due to an excessive amount of gravel that has created an uneven and unstable surface. Plaintiff claims that such a condition places anyone driving along the service road in danger of sliding into on-coming trains or over the near-vertical embankment along the Tug Fork River. (<u>Id.</u> ¶ 31). In addition, severe flooding in late May 2009 and a pattern of heavy rain thereafter contributed to the continued erosion and slippage along the service road. (<u>Id.</u> ¶ 32).

---

[5] Plaintiff does not specify the Norfolk entity to which she refers.

Plaintiff also contends that defendants' refusal to maintain the service road has damaged her personal vehicles, and that spikes, metal plates, and clamps (railroad materials) are often found in the roadway.  Plaintiff also complains that all-terrain vehicle ("ATV") traffic has lately increased on the service road such that it creates uneven and hazardous conditions.  (Id. ¶ 34-35).

Finally, plaintiff alleges that the obscure nature of the service road recently impeded emergency service personnel who responded to a sudden illness she experienced, and it more recently delayed law enforcement officers responding to an attempted forced entry of her home.  (Id. ¶ 36).  In a similar vein, defendants allegedly refused to allow public telephone utility Frontier Communications access to the service road, in an effort to make necessary repairs to her service, and that as a result, she was without public telephone service for approximately six weeks.  (Id. ¶ 37).

Plaintiff filed her initial complaint in the Circuit Court of Mingo County, West Virginia, on October 20, 2011.  She filed an amended complaint on October 25, 2011.  The amended complaint sets forth seven counts.  Counts I and II seek declaratory and injunctive relief with respect to an alleged easement by implication and an easement by necessity,

13

respectively.  Count III alleges breach of contract.  Count IV,
styled "nonfeasance, misfeasance, and malfeasance," appears to
allege the violation a public duty.  Count V alleges "Estoppel
by Negligence" and Count VI alleges "Hazardous Negligence."
Finally, Count VII alleges intentional infliction of mental and
emotional distress.  On November 18, defendants removed,
invoking the court's diversity jurisdiction.  Plaintiff moved to
remand on December 23, 2011, and defendants Norfolk Southern
Corporation and Stepp each seek dismissal on several grounds set
forth below.  Plaintiff also moved for leave to amend on
February 17, 2012.

## II.   Motion to Remand

### A.   Fraudulent Joinder

"A defendant may remove any action from a state court
to a federal court if the case could have originally been
brought in federal court."  Yarnevic v. Brink's, Inc., 102 F.3d
753, 754 (4th Cir. 1996) (citing 28 U.S.C. § 1441).  Federal
district courts have original jurisdiction over actions between
citizens of different states in which the matter in controversy
exceeds $75,000, exclusive of interest and costs.  28 U.S.C.
§ 1332(a).

14

The doctrine of fraudulent joinder permits a district court to "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction." Mayes v. Rapoport, 198 F.3d 457, 461 (4th Cir. 1999). Our court of appeals lays a "heavy burden" upon a defendant claiming fraudulent joinder:

> "In order to establish that a nondiverse defendant has been fraudulently joined, the removing party must establish either: [t]hat there is no possibility that the plaintiff would be able to establish a cause of action against the in-state defendant in state court; or [t]hat there has been outright fraud in the plaintiff's pleading of jurisdictional facts."

Id. at 464 (emphasis in original) (quoting Marshall v. Manville Sales Corp., 6 F.3d 229, 232 (4th Cir. 1993)). The applicable standard "is even more favorable to the plaintiff than the standard for ruling on a motion to dismiss." Hartley v. CSX Transp., Inc., 187 F.3d 422, 424 (4th Cir. 1999). Indeed, "'the defendant must show that the plaintiff cannot establish a claim against the nondiverse defendant even after resolving all issues of fact and law in the plaintiff's favor.'" Mayes, 198 F.3d at 464 (quoting Marshall, 6 F.3d at 232–33)).

As Hartley illustrates, fraudulent joinder claims are subject to a rather black-and-white analysis in this circuit. Any shades of gray are resolved in favor of remand. See

15

<u>Hartley</u>, 187 F.3d at 425.  At bottom, a plaintiff need only demonstrate a "glimmer of hope" in order to have his claims remanded:

> In all events, a jurisdictional inquiry is not the appropriate stage of litigation to resolve . . . various uncertain questions of law and fact . . . Jurisdictional rules direct judicial traffic.  They function to steer litigation to the proper forum with a minimum of preliminary fuss.  The best way to advance this objective is to accept the parties joined on the face of the complaint unless joinder is clearly improper.  To permit extensive litigation of the merits of a case while determining jurisdiction thwarts the purpose of jurisdictional rules.
>
> * * * *
>
> We cannot predict with certainty how a state court and state jury would resolve the legal issues and weigh the factual evidence in this case.  [Plaintiff's] claims may not succeed ultimately, but ultimate success is not required . . . . Rather, there need be only a slight possibility of a right to relief.  Once the court identifies this glimmer of hope for the plaintiff, the jurisdictional inquiry ends.

<u>Id.</u> at 425-26 (citations omitted).  In determining "whether an attempted joinder is fraudulent, the court is not bound by the allegations of the pleadings, but may instead consider the entire record, and determine the basis of joinder by any means available."  <u>Mayes</u>, 198 F.3d at 464 (internal quotations omitted).

Inasmuch as defendant does not allege any fraud in the pleading of jurisdictional facts, the only question for fraudulent joinder purposes is whether plaintiff has any

16

possibility of recovery in state court against the nondiverse
defendant.  Plaintiff asserts each count against "defendants" or
"Norfolk defendants" generally, and does not specifically aim
one or more counts at the nondiverse defendant.  Even so, the
court will examine in turn plaintiff's possibility of a right to
relief against the nondiverse defendant as to each count.

        Plaintiff contends generally that the nondiverse
defendant, Jack Stepp, may be held liable for all causes of
action asserted in the amended complaint because he acted
"outside of the scope of his employment," though she does not
cogently explain how this assertion bears on the claims alleged.
(Pl.'s Mem. 4).  Defendant rejects plaintiff's scope of
employment argument, noting that plaintiff has failed to state a
prima facie case against the nondiverse defendant on any of the
claims contained in the amended complaint.

        In Counts I and II, plaintiff seeks declaratory and
injunctive relief with respect to an easement by implication and
easement by necessity, respectively, which allegedly exist
across the derelict railroad crossing.  It is undisputed that
Stepp, employed as a track supervisor for defendant Norfolk
Railway, has no interest in the disputed properties.  In the
absence of such an interest, plaintiff has no possibility of a
right to relief against the nondiverse defendant with respect to

Counts I and II.

In the Count III breach of contract claim, plaintiff alleges that the McCoys entered into a three-party contract with Massey Coal Sales, Inc., through Tug Valley Co., and defendant Norfolk Railway, with respect to the property transaction that resulted in the McCoys taking ownership of the new parcel. Inasmuch as plaintiff does not contend that Stepp was a party to this alleged agreement, plaintiff has no right of relief from the nondiverse defendant with respect to its purported breach.

Count IV, titled "nonfeasance, misfeasance, and malfeasance," appears to allege that as "quasi-public" entities, the Norfolk defendants failed in their duty to protect the public's interest, particularly with regard to their refusal to recognize an easement across railway property. Once again, plaintiff does not direct this claim against the nondiverse defendant, and it is unclear how such a claim would lie against him as an employee of defendant Norfolk Railway.

Next, plaintiff alleges "estoppel by negligence" and "hazardous negligence" against undesignated "Norfolk Defendants" in Counts V and VI, respectively. Once again, plaintiff asserts the claim against "Norfolk Defendants" generally without reference to the nondiverse defendant. Based on the allegations

set forth, the court cannot discern what duty, if any, the
nondiverse defendant owed to plaintiff so as to render him
potentially liable under a negligence theory.  Without the
existence of a duty owed, negligence cannot lie against the
nondiverse defendant.

Finally, Count VII alleges intentional infliction of
emotional distress against the "Norfolk Defendants" and
"Defendants" generally.  McCoy contends that the "actions of
Norfolk Defendants induced the Plaintiff into establishing her
residence at its current location by knowingly and purposefully
withholding the intimate knowledge that the road was affected by
a public interest and were instrumental in the establishing of
her residence and ongoing investments."  (Amended Complaint,
Count VII ¶ 1).  Plaintiff alleges no specific act in this count
that could serve as a basis for the intentional infliction of
emotional distress claim against the nondiverse defendant.

It is noted that West Virginia law allows recovery
"for emotional distress arising out of extreme and outrageous
conduct intentionally or recklessly caused by the defendant . .
. ." <u>Harless v. First Nat'l Bank in Fairmont</u>, 289 S.E.2d 692 (W.
Va. 1982).  Liability is imposed only when conduct is "so
outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as

19

atrocious and utterly intolerable in a civilized community." Dzinglski v. Weirton Steel Corp., 445 S.E.2d 219, 224 (W. Va. 1994) (internal quotation and citations omitted).[6]

Simply put, plaintiff does not allege that Stepp committed any acts that could support a claim of intentional infliction of emotional distress. The only act alleged as the basis for this claim -- that defendants induced plaintiff into establishing her residence on the new parcel -- occurred years before Stepp began interacting with plaintiff as a track supervisor for defendant Norfolk Railway. On these allegations, plaintiff has no possibility of a right to relief from the nondiverse defendant in Count VII.

In sum, having found that plaintiff has no possibility

---

[6] The required elements of an intentional or reckless infliction of emotional distress are as follows:

It must be shown: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

Syl. pt. 3, in part, Travis v. Alcon Labs., Inc., 504 S.E.2d 419, 421 (W. Va. 1998).

of relief from the nondiverse defendant, the court finds that Stepp was fraudulently joined.

B.   Amount in Controversy

Plaintiff also contends that the action should be remanded inasmuch as her claims do not meet the jurisdictional amount in controversy requirement.

In a case that is filed initially in federal court, a district court has original jurisdiction if the requisite diversity of citizenship exists unless it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount." St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938). A different analysis applies "in removal situations . . . in which the plaintiff has made an unspecified demand for damages in state court." Landmark Corp. v. Apogee Coal Co., 945 F. Supp. 932, 935 (S.D. W. Va. 1996).

A defendant who removes a case from state court in which the damages sought are unspecified, asserting the existence of diversity jurisdiction, must prove by a preponderance of the evidence that the matter in controversy exceeds the jurisdictional amount of $75,000. Tapscott v. MS Dealer Serv. Corp., 77 F.3d 1353, 1357 (11th Cir. 1996); De

21

Aguilar v. Boeing Co., 11 F.3d 55, 58 (5th Cir. 1993) and De

Aguilar v. Boeing Co., 47 F.3d 1404 (5th Cir. 1995); Gafford v.

Gen. Elec. Co., 997 F.2d 150, 158 (6th Cir. 1993); Gaus v.

Miles, Inc., 980 F.2d 564, 567 (9th Cir. 1992); Sayre v. Potts,

32 F.Supp.2d 881, 885 (S.D. W. Va. 1999); Landmark Corp., 945 F.

Supp. at 935.

A court often considers the entire record and makes an

independent evaluation of whether the amount in controversy has

been satisfied.  Weddington v. Ford Motor Credit Co., 59 F.

Supp. 2d 578, 584 (S.D. W. Va. 1999); Mullins v. Harry's Mobile

Home, Inc., 861 F. Supp. 22, 23 (S.D. W. Va. 1994).  It has been

stated as follows:

> Important items of proof would be the type and extent
> of the plaintiff's injuries, . . . and the possible
> damages recoverable therefore, including punitive
> damages if appropriate. . . . The defendant may also
> present evidence of any settlement demands made by the
> plaintiff prior to removal . . . . although the weight
> to be given such demands is a matter of dispute among
> courts.

Watterson v. GMRI, Inc., 14 F. Supp. 2d 844, 850 (S.D. W. Va.

1997).  Relevant to this case, it is well-established that "[i]n

a suit for injunctive relief, 'the amount in controversy is

measured by the value of the object of the litigation.'"  Macken

v. Jensen, 333 F.3d 797, 799 (7th Cir. 2003) (citing Hunt v.

Washington State Apple Adver. Comm'n, 432 U.S. 333 (1977)).

Ultimately, the court "'is not required to leave its common

sense behind'" in determining the jurisdictional amount.  <u>Sayre</u>,
32 F. Supp. 2d at 886-87 (quoting <u>Mullins</u>, 861 F. Supp. at 24).

Plaintiff contends that defendants' assertion that her
alleged damages exceed the jurisdictional threshold "is highly
speculative."  (Pl.'s Mem. 10).  As set forth in the amended
complaint, plaintiff seeks both injunctive relief and
compensatory damages.  In addition to unspecified damages for
mental and emotional distress, plaintiff requests the following:

> That the Court order the Norfolk Defendants to widen
> the access road and install guard rails where
> necessary and to maintain the access road so that it
> is made safe to travel, or in alternative, order the
> Defendants to reinstall the railroad crossing along
> with necessary warning devices to resolve the safety
> issues associated with the limited sight distance
> identified by the Defendants . . . .

(Amended Complaint, WHEREFORE clause).

Defendants offer the affidavit of Chris Carney,
employed by defendant Norfolk Railway as the division engineer
for the Pocahontas Division in Bluefield, West Virginia.  As
part of his position with Norfolk Railway, Carney is responsible
for overseeing the installation of crossings for the division in
which the McCoy's new parcel is located.  (Carney Aff. ¶ 4).
Carney avers that the cost of reinstalling the crossing is
approximately $6,100, and that the cost of setting up required
"active warning devices" at the crossing will likely exceed

$100,000.  (Id. ¶¶ 5-7).  He further avers that the multi-year maintenance schedule for the new crossing would be approximately $9,000 per eight-year cycle.  (Id. ¶¶ 9-10).  Finally the costs of additional maintenance to the service road, including the widening of the roadway and installation of guard rails, would amount to approximately $5,000 per year.  (Id. ¶¶ 11-14). Plaintiff does not respond to defendants' cost approximations.

Examining each of plaintiff's requests for injunctive relief and compensatory damages, defendants have met their burden.  In the absence of facts indicating the contrary, the court is satisfied that the reestablishment of the derelict railroad crossing and the corresponding installation of necessary safety apparatuses, combined with the regular maintenance arising therefrom, exceed the $75,000 jurisdictional threshold.

In sum, having found that plaintiffs have no possibility of relief against the nondiverse defendant, and that plaintiff's claims exceed the amount in controversy requirement, the court finds diversity jurisdiction lies.  Plaintiff's motion to remand is thus denied.

Having found that plaintiff has failed to state a claim against nondiverse defendant Stepp, his motion to dismiss

is granted, and he is accordingly dismissed.  See Hartley, 187 F.3d at 424.

### III.   Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a) permits amendment of a complaint after a responsive pleading has been filed "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Even so, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999).  Defendants oppose plaintiff's motion.

Plaintiff moves to amend on two grounds.  First, she seeks to do so in order to "perfect service on the Defendant Norfolk Southern Corporation."  (Motion to Amend at 2).  She goes on to state that "service on Defendant Norfolk Southern Corporation will be perfected by serving the secretary of Norfolk Southern Corporation at its principal office in Norfolk, Virginia. . . ."  (Id.).  Plaintiff, though, does not explain

how an amendment will aid in the accomplishment of this goal.[7]
Second, plaintiff seeks amendment so that she may attempt to
cure the pleading defects identified by defendant with respect
to the allegations against nondiverse defendant Stepp.  Inasmuch
as the operative pleading for the purposes of a motion to remand
is that which existed at the time of removal, plaintiff's
request to amend her factual allegations against the nondiverse
defendant would in this instance be ineffective in any event.
See supra n. 1.

        Finding that plaintiff's proposed amendment would be
futile, the court concludes that plaintiff's motion for leave to
amend must be denied.

    IV.   Norfolk Southern Corporation's Motion to Dismiss and
          Motion to Quash Service of Process

        Defendant Norfolk Southern Corporation moves to
dismiss pursuant to Federal Rule of Civil Procedure 12(b)(5) for
insufficient service of process, or alternatively, to quash
plaintiff's service of process.

        On October 21, 2011, prior to removal, plaintiff

---

        [7] As defendants correctly observe, plaintiff is free to
attempt service on Norfolk Southern Corporation by any proper
means at any time without leave of the court and without an
amended pleading.

attempted to serve defendant Norfolk Southern Corporation by serving Fred Adkins, the registered agent for service of process for defendant Norfolk Railway, a subsidiary of Norfolk Southern Corporation.  (Exhibit C, Def.'s Mem; Notice of Removal ¶ 10). It is undisputed that Norfolk Southern Corporation is not authorized to conduct business in the state of West Virginia. Plaintiff baldly asserts that service on the subsidiary is sufficient to bind the parent simply "because of the parent-subsidiary relationship between Norfolk Southern Railway Company and Norfolk Southern Corporation."  (Amended Complaint, Parties ¶ 3).  Defendants contend that service of process on a subsidiary's registered agent is not effective service of the parent corporation when the parent is unauthorized to transact business within West Virginia.

     A defendant may move for dismissal of a plaintiff's claims for "insufficient service of process" pursuant to Federal Rule of Civil Procedure 12(b)(5).  Plaintiff bears the burden of establishing the validity of service once that service is contested.  See Homer v. Jones-Bey, 415 F.3d 748, 754 (7th Cir. 2005) ("it is the plaintiff who ordinarily bears the burden of demonstrating that the district court had personal jurisdiction over the parties, including valid service of process"); Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d

476, 488 (3d Cir. 1993) ("the party asserting the validity of service bears the burden of proof on that issue").  State law governs whether service of process is properly effected if attempted prior to removal.  <u>See, e.g.</u>, <u>Brazell v. Green</u>, 67 F.3d 293, 1995 WL 572890 (4th Cir. 1995) (Table) (unpublished); <u>Wolfe v. Green</u>, 660 F. Supp. 2d 738, 745-46 (S.D. W. Va. 2009) (citing <u>Lee v. City of Beaumont</u>, 12 F.3d 933, 936-37 (9th Cir. 1993)); 4A Wright & Miller, <u>Federal Practice and Procedure</u>, § 1082 (3d ed.).  Inasmuch as Norfolk Southern Corporation was purportedly served on October 21, 2011, nearly a month prior to removal on November 18, 2011, state law governs the analysis.

Pursuant to West Virginia Rule of Civil Procedure 4(d)(8), service upon a foreign corporation not qualified to do business in the state maybe be effected

> (A) by delivering or mailing in accordance with paragraph (1) above a copy of the summons and complaint to any officer, director, trustee, or agent of such corporation; or

> (B) by delivering or mailing in accordance with paragraph (1) above copies thereof to any agent or attorney in fact authorized by appointment or by statute to receive or accept service in its behalf.

W. Va. R. Civ. P. 4(d)(8).[8]  See also W. Va. Code § 56-3-14 ("If [a foreign] corporation has not qualified to do . . . business under the laws of this State, service may be made by delivering,

---

[8] Paragraph (1) of section (d) of this rule provides, in relevant part, as follows:

(d) Manner of service. - Personal or substituted service shall be made in the following manner:

(1) Individuals. - Service upon an individual other than an infant, incompetent person, or convict may be made by:

(A) Delivering a copy of the summons and complaint to the individual personally; or

(B) Delivering a copy of the summons and complaint at the individual's dwelling place or usual place of abode to a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purport of the summons and complaint; or

(C) Delivering a copy of the summons and complaint to an agent or attorney-in-fact authorized by appointment or statute to receive or accept service of the summons and complaint in the individual's behalf; or

(D) The clerk sending a copy of the summons and complaint to the individual to be served by certified mail, return receipt requested, and delivery restricted to the addressee; or

(E) The clerk sending a copy of the summons and complaint by first class mail, postage prepaid, to the person to be served, together with two copies of a notice and acknowledgment conforming substantially to Form 14 and a return envelope, postage prepaid, addressed to the clerk.

within the State, a copy of the process or notice to any
officer, director or agent of such corporation acting or
transacting business for it in this State.").

          With respect to plaintiff's claim that her service on
the agent of the subsidiary is deemed to be service on the
parent, the West Virginia Supreme Court of Appeals has held that
"the mere existence of a parent-subsidiary relationship, without
a more definite showing of the parent's control of the
subsidiary, will not suffice to permit service of the subsidiary
through the parent corporation."  Bowers v. Wurzburg, 519 S.E.2d
148, 164 (W. Va. 1999) (citing Norfolk S. Ry. Co. v. Maynard,
437 S.E.2d 277, 283 (W. Va. 1993)); see also Cannon Mfg. Co. v.
Cudahy Packing Co., 267 U.S. 333 (1925).  The Norfolk court
explained that

> [w]hen a parent-subsidiary relationship exists between
> corporations, either the parent or the subsidiary may
> be the agent of the other related corporation for the
> purpose of service of process.  Although there is no
> precise test to determine how much control a parent
> corporation must exert over its domestic subsidiary
> before one corporation will be deemed an agent of the
> other for the purpose of service of process, each case
> will be considered on its facts to determine if more
> than a parent-subsidiary relationship exists.

Syl. pt. 3, in part, Norfolk, 437 S.E.2d at 278.  "Essentially,
the question of when one corporation is another corporation's
agent for service of process is one of agency law with

30

particular emphasis on the nature of the relationship and the degree of control exercised." Id. at 283.

Plaintiff has not set forth any facts demonstrating that the parent company, Norfolk Southern Corporation, exercises a degree of control over its subsidiary such that service on the subsidiary is effective against its parent.  In the absence of such facts, plaintiff's service on Fred Adkins, the registered agent for service of process for the subsidiary, Norfolk Railway, is ineffective as to the parent Norfolk Southern Corporation.

Accordingly, the court concludes that plaintiff has failed to show that Norfolk Southern Corporation has been properly served in this case.  Although Norfolk Southern Corporation urges the court to dismiss it from this action, the court finds the appropriate remedy under the circumstances to be to quash the service of process upon Norfolk Southern Corporation.  See Vorhees v. Fischer & Krecke, 697 F.2d 574, 576 (4th Cir. 1983) (quoting Bailey v. Boilermakers Local 667 of Int'l Bhd. of Boilermakers, 480 F. Supp. 274, 278 (N. D. W. Va. 1979) ("If the first service of process is ineffective, a motion to dismiss should not be granted, but rather the Court should treat the motion in the alternative, as one to quash the service of process . . . .")).

31

V.   Conclusion

For the foregoing reasons, the court ORDERS as follows:

1) That plaintiff's motion to remand be, and it hereby is, denied;

2) That plaintiff's motion for leave to amend be, and it hereby is, denied;

3) That defendant Stepp's motion to dismiss be, and it hereby is, granted;

4) That defendant Norfolk Southern Corporation's motion to dismiss, or alternatively, to quash service, be, and it hereby is, granted to the extent that plaintiff's service of process upon Norfolk Southern Corporation is quashed; and

5) That plaintiff has thirty days from the date of this order within which to properly serve Norfolk Southern Corporation, and that unless service of process has been obtained by that date, or just cause is shown by that date by plaintiff for failure to effect service of process within the thirty day period, Norfolk Southern Corporation shall be dismissed for failure to effect service of process.

32

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.

Enter: March 14, 2012

John T. Copenhaver, Jr.
United States District Judge